UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN THE MATTER OF AN APPLICATION | : | |
| OF THE UNITED STATES OF AMERICA | : | NO. |
| FOR AN ORDER AUTHORIZING THE | : | |
| INSTALLATION AND USE OF A PEN | : | |
| REGISTER AND TRAP AND TRACE | : | **FILED UNDER SEAL** |
| DEVICE, DISCLOSURE OF CELL SITE | : | |
| INFORMATION AND DISCLOSURE OF | : | |
| TELECOMMUNICATIONS RECORDS | : | |
| INCLUDING PRECISE LOCATION DATA | : | October 24, 2017 |

**MASTER AFFIDAVIT**

## I.   **INTRODUCTION**

I, Ryan Oates, being duly sworn, depose and state as follows:

1.     I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.     I have been employed as a Special Agent with the Federal Bureau of Investigation (the "FBI") since 2016.  I attended the Basic Field Training Course at the FBI Academy in Quantico, Virginia.  I am currently assigned to the New Haven Division of the FBI, where I have been tasked with investigating violent criminal street gangs and organized criminal enterprises involving the smuggling, distribution, and sale of illegal drugs.  My training and experience as a Special Agent and my conversations with other law enforcement officials familiar with violent crime and violations of federal narcotics and firearms laws form the basis of my opinions and conclusions set forth below, which I drew from the facts set forth herein.

3.     During my career in law enforcement, I have participated in multiple investigations involving individuals suspected of distributing illegal drugs, participated in

1

controlled purchases of illegal drugs utilizing informants and cooperating witnesses, conducted

electronic as well as physical surveillance of individuals involved in illegal drug distribution,

analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants

and subjects, as well as other local, state, and federal law enforcement officers, regarding the

manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute

their illegal drugs.  As such, I am familiar with the behaviors, methods, and common practices of

persons and organizations that illegally traffic and distribute controlled substances, as well as the

devices commonly utilized by them.

     4.     Based on my training and experience, I know that drug traffickers often use

cellular telephones, and they often speak to one another using coded, cryptic, or slang words and

phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify

them and their activities and to seize their drugs and/or assets.  Drug traffickers often store the

phone numbers of their customers, associates or their sources of illegal narcotics within the

electronic memory of their phones, including in contact lists, address lists, recent call lists and

electronic calendars.  I know that drug traffickers frequently have access to several cellular

telephones, and that they periodically use newly acquired cellular telephones.  I also know that

narcotics traffickers and distributors frequently use cellular telephones subscribed to by other

persons and pre-paid cellular telephones that require the purchaser to provide little or no

identifying information to purchase, activate, and utilize, all of which is done in an effort to

avoid detection and thwart the efforts of law enforcement.

     5.     I know, based upon my training and experience, that narcotics traffickers and

distributors often segregate various aspects of their illicit business, and use different telephones

when tending to each of the various aspects, in an effort to thwart law enforcement and insulate

themselves and their confederates. For example, drug dealers often use one telephone to contact customers and another to contact their narcotics source(s) of supply. In addition, narcotics traffickers and drug dealers often use different telephones to deal with different "lines" of customers. For example, a drug dealer may use one telephone to contact customers who regularly purchase small pre-packaged quantities of narcotics and another telephone for customers who regularly purchase larger quantities, or may use different telephones to distribute different types of narcotics. Similarly, drug dealers, whose business extends into multiple states, also sometimes use one telephone for local customers and another telephone for out-of-state customers. This enables distributors to accommodate a high volume of narcotics trafficking calls. The use of two or more telephones interchangeably also enables distributors to immediately terminate service on one telephone without crippling their illegal business, if they believe the telephone is being targeted by law enforcement for installation of a court-authorized wiretap. Drug traffickers are constantly on the move throughout the day and by keeping their cell phones on their person, they can stay in frequent communication with their drug trafficking associates so as to keep track of their associates' whereabouts if a drug transaction is planned and imminent. When expecting a supply of narcotics, traffickers will use cellular phones to stay in communication with their source of supply to facilitate the drug transaction. Likewise, when expecting to sell narcotics to a customer, traffickers will use cellular phones to stay in communication with their customers.

6.    I submit this affidavit in support of (a) an Application for an Order authorizing the installation and use of a pen register and trap-and-trace device on cellular telephone number ▇▇▇▇-5698 ("**Target Telephone 2**"); and (b) of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the

location of **Target Telephone 2**, with International Mobile Subscriber ("IMSI")

███████████████, whose service provider is T-Mobile, a wireless telephone service provider

headquartered at 4 Sylvan Way, Parsippany, New Jersey. **Target Telephone 2** is described

herein and in Attachment A, and the location information to be seized is described herein and in

Attachment B. **Target Telephone 2** has been in service since February 16, 2017, is subscribed

to ███████████████████████████████, Connecticut, and is believed to be utilized by

███████████████████████

7.      In my training and experience, I have learned that T-Mobile is a company that

provides cellular telephone access to the general public. I also know that providers of cellular

telephone service have technical capabilities that allow them to collect and generate at least two

kinds of information about the locations of the cellular telephones to which they provide service:

(1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data,

also known as "tower/face information" or cell tower/sector records. E-911 Phase II data

provides relatively precise location information about the cellular telephone itself, either via GPS

tracking technology built into the phone or by triangulating on the device's signal using data

from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna

towers covering specific geographic areas) that received a radio signal from the cellular

telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone is

connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10

or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not

necessarily serve every call made to or from that device. Accordingly, cell-site data is typically

less precise that E-911 Phase II data.

8. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the **Target Telephone 2**, including by initiating a signal to determine the location of **Target Telephone 2** on T-Mobile's network or with such other reference points as may be reasonably available.

9. Based on my training and experience, I know that T-Mobile can collect cell-site data about **Target Telephone 2**.

10. For the reasons set forth in this affidavit, there are reasonable grounds and probable cause to believe, and I do believe, that the information likely to be obtained by the installation and use of a pen register device and trap-and-trace device is relevant to an ongoing criminal investigation, and that specific and articulable facts are set forth herein showing that there are reasonable grounds and probable cause to believe that the electronic communications records and/or information sought are relevant and material to the ongoing criminal investigation relating to the possession with intent to distribute and the distribution of narcotics, in violation of 21 U.S.C. § 841(a)(1), and a conspiracy to possess with intent to distribute and to distribute narcotics, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (the "Target Offenses"). Furthermore, based on the facts set forth in this affidavit, there is probable cause to believe that violations of the Target Offenses have been committed, are being committed, and will be committed by ▮▮▮▮▮▮ and his co-conspirators, both known and unknown. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and and will lead to the identification of individuals who are engaged in the commission of these offenses.

11. I have personally participated in this investigation, and I am familiar with the facts and circumstances of the offenses described in this affidavit. The statements contained in

this affidavit are based on: my personal knowledge, training, and experience; information provided by Task Force Officers of the FBI, members of the Norwich, Connecticut Police Department, and members of the Waterford, Connecticut Police Department; information developed through physical surveillance; and information developed through the court-authorized interception of wire and electronic communications over ▮▮▮▮-1129 (Target Telephone 1), which investigators believe is being utilized by JOSEPH BARROS ("BARROS") in furtherance of narcotics trafficking activities as outlined below. On October 4, 2017, United States District Judge Vanessa L. Bryant, District of Connecticut, authorized the interception of wire and electronic communications occurring over Target Telephone 1.

12.     Since this affidavit is being submitted for the limited purpose of the aforementioned authorizations, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the foundation necessary to support the issuance of the requested order.

## II.   **CONFIDENTIAL SOURCES**

13.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14. ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

## III.   FACTS AND CIRCUMSTANCES RELEVANT TO REQUESTED ORDER

15.    The United States Government, including the FBI, is investigating a drug trafficking organization operating within Connecticut. The investigation concerns possible violations by known and unknown individuals of, *inter alia*, 21 U.S.C. §§ 841(a)(1) and 846.

### FACTS TO ESTABLISH REASONABLE GROUNDS TO BELIEVE THAT JOSEPH BARROS DISTRIBUTES NARCOTICS USING TARGET TELEPHONE 1

16.    In June 2017, investigators met with CS1, who stated he/she knows of a largescale heroin and cocaine distributor selling in the Norwich, Connecticut area.  CS1 said he/she only knows this distributor as "Joe-Joe", and provided investigators with a photograph of "Joe-Joe".  Norwich Police Department Narcotics Detective Jason Calouro, who is familiar with

BARROS through past police-related contacts, identified the person depicted in the photograph as BARROS. CS1 stated he/she would be willing to purchase cocaine from BARROS for law enforcement purposes.

17.     BARROS was previously identified as a large-scale drug dealer in a prior investigation by the FBI and Norwich Police Department between 2014 and 2015. In that investigation, BARROS was a partner of ███████████████████ The FBI and Norwich Police Department conducted a controlled purchase of 50 grams of cocaine from ███████ who, based on that sale and other information obtained in that investigation, was convicted of Sale of Cocaine in violation of Connecticut State Law, Chapter 420b, Section 21a-277(a), and sentenced to one year in jail. At the time, the investigation was unable to gather enough evidence to arrest and convict BARROS for his role in ███████ drug trafficking operation. Investigators believe that BARROS has since taken the place of ███████ in the operation.

18.     The controlled purchases listed below do not constitute a record of all of the controlled purchases in this investigation. The numbering system, therefore, does not represent the order and/or sequence of controlled purchases in this investigation and is only used for the purposes of this affidavit.

19.     **CONTROLLED BUY #1:** During the week of June 25, 2017, CS1 met with investigators for the purpose of purchasing cocaine from BARROS. During this meeting, on June 26, 2017 CS1, in the presence of law enforcement officers, placed a call and text message to BARROS on Target Telephone 1, which CS1 knew to be used by BARROS, in an effort to purchase cocaine. The investigators confirmed that the number entered into CS1's telephone was that of Target Telephone 1. CS1 reported that he/she had successfully contacted BARROS

8

on numerous occasions in the past and discussed narcotics transactions with BARROS on Target Telephone 1.  Further, for over a year, CS1 has always known BARROS to use this phone and has never known BARROS to change phone numbers.  BARROS responded a short time later and engaged with CS1 in a conversation on Target Telephone 1 regarding the purchase and sale of cocaine.  The investigators were able to overhear this conversation, as CS1 put the call on speakerphone.  BARROS asked CS1 how much he/she wanted to purchase, and CS1 responded by indicating a specific weight.  BARROS requested that CS1 meet him at a specific location.[1] Law enforcement officers searched CS1 and his/her vehicle for contraband and provided CS1 with a sum of cash.  CS1 then traveled to the meet location while under constant surveillance by law enforcement officers.  CS1 provided the agreed-upon sum of money to BARROS, who in turn provided CS1 with the correct quantity of suspected narcotics.  CS1 submitted the suspected narcotics to the investigators, which were seized as evidence, and which field tested positive for cocaine.  Law enforcement officers searched CS1 again, and confirmed that no additional contraband was in his/her possession.  During the course of the controlled buy, CS1 did not meet with any persons besides BARROS.  CS1 told the investigators that he/she purchased the suspected cocaine from BARROS with the approved funds while inside of BARROS' vehicle.

20.     **CONTROLLED BUY #2:** During the week of July 9, 2017, CS1 met with investigators for the purpose of a subsequent purchase of cocaine from BARROS.  During this meeting, CS1, in the presence of law enforcement officers, placed a call to BARROS on Target Telephone 1 in an effort to purchase cocaine.[2]   The investigators confirmed that the number

---

[1] This phone call and the controlled purchase were not recorded, but CS1 was under physical surveillance the entire time.

[2] This phone call and the controlled purchase were not recorded, but CS1 was under physical surveillance the entire time.  After this controlled buy, CS1 agreed to wear a non-recording audio transmitter for the next controlled buy.

entered into CS1's telephone was that of Target Telephone 1. BARROS and CS1 again engaged in a conversation on Target Telephone 1 regarding the purchase and sale of cocaine. BARROS asked CS1 how much he/she wanted to purchase, and CS1 responded by indicating a specific weight. BARROS requested that CS1 meet him at a specific location in ten (10) minutes. Law enforcement officers searched CS1 and his/her vehicle for contraband and provided CS1 with a sum of cash. CS1 then traveled to the meet location while under constant surveillance by law enforcement officers. CS1 provided the agreed-upon sum of money to BARROS, who in turn provided CS1 with the correct quantity of suspected narcotics. CS1 submitted the suspected narcotics to the investigators, which were seized as evidence, and which field tested positive for cocaine. Law enforcement officers searched CS1 again, and confirmed that no additional contraband was in his/her possession. During the course of the controlled buy, CS1 did not meet with any persons besides BARROS. CS1 told the investigators that he/she purchased the cocaine from BARROS with the approved funds while inside of BARROS' vehicle.

21.     **CONTROLLED BUY #3:** During the week of July 23, 2017, CS1 received a text message from BARROS using coded language that CS1 understood to mean that BARROS wanted to sell cocaine to CS1. At the behest of the FBI, CS1 returned the call and arranged a subsequent purchase of cocaine from BARROS. CS1 and BARROS agreed upon a specific weight, price, and meeting time. CS1 later met with investigators for the purpose of the purchase of cocaine from BARROS. CS1 showed the investigators the text message and call log to corroborate the above-described communication. During this meeting, CS1, in the presence of law enforcement officers and on speakerphone, placed a call to BARROS on Target Telephone 1 to verify that the exchange would still take place.[3]   The investigators confirmed that the number

---

[3] This phone call and the controlled purchase were not recorded, but CS1 was under physical surveillance the entire time. CS1 had agreed to wear an audio transmitter for this controlled purchase, however the investigators were

entered into CS1's telephone was that of Target Telephone 1. BARROS advised CS1 that he would be at the prearranged meet location in ten (10) minutes. Law enforcement officers searched CS1 and his/her vehicle for contraband and provided CS1 with a sum of cash. CS1 then traveled to the meet location while under constant surveillance by law enforcement officers. CS1 provided the agreed-upon sum of money to BARROS, who in turn provided CS1 with the correct quantity of suspected narcotics. CS1 submitted the suspected narcotics to the investigators, which were seized as evidence, and which field tested positive for cocaine. Law enforcement officers searched CS1 again, and confirmed that no additional contraband was in his/her possession. During the course of the controlled buy, CS1 did not meet with any persons besides BARROS. CS1 told the investigators that he/she purchased the cocaine from BARROS with the approved funds while inside of BARROS' vehicle. CS1 also told investigators that BARROS offered to sell CS1 more cocaine in the future.

22.    The specific sum of money paid and weight of the narcotics purchased on these dates are known to the Affiant; these details, however, have been excluded to protect the identity of the Confidential Informant.

## FACTS TO ESTABLISH REASONABLE GROUNDS TO BELIEVE THAT ███████ ███████ SUPPLIES NARCOTICS UTILIZING TARGET TELEPHONE 2

23.    I believe **Target Telephone 2** to be associated with ███████ because a search of publicly accessible social media websites indicated this number is associated with the Facebook account of '███████' (User Name: ███████; User ID: ███████). The person depicted in the profile pictures from this account appears to be the same person as the booking photograph of ███████ from when he surrendered to Norwich, Connecticut Police

---

unable to hear the conversation between CS1 and Barros during the controlled purchase due to excessive background noise.



Department on or about August 19, 2011 on a warrant. The provider for **Target Telephone 2** is

T-Mobile, and the subscriber is ████████████████████████, Connecticut.

Connecticut Police Department records as well as ██████████ driver's license list ██████████

residence as ████████████████████████, Connecticut. The Connecticut

Department of Corrections and United States Bureau of Prisons know ██████████ to go by

"Budda". Furthermore, ██████████ criminal history record lists ██████████ and Budda as

aliases. An FBI Confidential Source ("CS2") with excellent access stated that BARROS went to

██████████ residence and sold ██████████ one kilogram of cocaine between May and June of

2015. CS2 said that at the time, BARROS was working with ████████████████.

24.     On October 4, 2017, United States District Judge Vanessa L. Bryant, District of

Connecticut, authorized the interception of wire and electronic communications occurring over

Target Telephone 1. The communications described in the following paragraphs were lawfully

intercepted pursuant to this order.[4]

25.     On October 5, 2017 between 7:00 pm and 7:05 pm, BARROS, over Target

Telephone 1, communicated with an Unknown Caller, at ██████-1744 via text message:

> Caller: Yoyo
> BARROS: Yo
> Caller: What up sir you around
> BARROS: Ya
> Caller: Is 25 min ok
> BARROS: Ya

26.     As these text messages with ██████-1744 were being sent and received,

surveillance observed BARROS leave ████████████████████████ Connecticut (identified as

██████████ residence) and head to the back parking lot of 7-Eleven in North Franklin,

---

[4] The use of brackets in the transcripts of the calls indicates additions from the author to assist the Court in interpreting terms or phrases.

Connecticut on Route 32. Surveillance observed a white male exit the driver's seat of a silver

Hyundai Elantra bearing Connecticut license plate ▇▇▇▇ and enter BARROS' front

passenger seat for only seconds before exiting again. This was in a manner similar to how CS1

would purchase narcotics from BARROS. Surveillance followed the Elantra to ▇▇▇▇

▇▇▇▇ Connecticut. This car is registered to ▇▇▇▇. Based on my training

and experience, as well as the training and experience of the law enforcement officers on the

surveillance team, I believe this meeting was a hand-to-hand drug transaction.

     27.    On October 10, 2017, surveillance observed a similar transaction in 7-Eleven

parking lot between BARROS a white male operating the same Hyundai. Following this

subsequent transaction, surveillance followed the Hyundai. The investigators noticed the

Hyundai speeding as it crossed into Waterford, Connecticut and arranged for the Waterford

Police Department to conduct a motor vehicle stop based on the motor vehicle violation. The

operator was identified as ▇▇▇▇ and the front seat passenger was identified as

▇▇▇▇ The officer was unable to independently gain probable cause to search the

vehicle, and ▇▇▇ and ▇▇ were released from the scene with a written warning.

     28.    On October 6, 2017 at 11:17 am, BARROS, utilizing Target Telephone 1,

communicated with ▇▇▇-0385, who investigators believe is ▇▇▇▇



       ▇ Hey, you got some choke [marijuana]? What you looking like?
       BARROS: I do, but I left the crib already.
       ▇ Say what?
       BARROS: I said I do, but I left the crib already.
       ▇ You say you're not at the crib?
       BARROS: I said I do got some choke, but I already left the crib.
       ▇ Oh. But tomorrow, what's the food [cocaine] looking like?
       BARROS: Right now I got a half, I got a half for you. I'm gonna need that money
       to grab some more, though.
       ▇ Yeah, I got you. I just didn't see your text.
       (BARROS and ▇ continue to talk about texting each other.)



BARROS: I ain't had the money to grab no more, so, I got like 20 grams. I could probably get you like a half, though [14 grams or half an ounce].
     Yeah, bring it. The white boy gave us the weed the other day.
BARROS: What white boy?
     I don't know who it was. It was this nigga's brother.
(Unintelligible)
     What you about to do? What you rushin' for?
BARROS: I gotta go. I'm about to go see this nigga Budda [     ].

29.      Based on my training and experience, the training and experience of other law enforcement officers familiar with narcotics distribution, and on the context of this conversation within this investigation, I believe that "food" is code for cocaine and "choke" is code for marijuana. Further, I believe that BARROS indicated that he only had 20 grams of cocaine, and was willing to give    "a half," meaning half an ounce, or 14 grams. Based on this conversation, I also believe that BARROS wanted the money to get more cocaine when he visited Budda, which is a nickname for

30.      On October 11, 2017 at 4:00 pm, BARROS received a call from      who was utilizing **Target Telephone 2**. BARROS asked      if he was back.      replied, "I'll be back um…I'm done, I'm just waiting for little Ju." BARROS asked, "What you think, like, an hour or two?"      then said he would be able to see BARROS after 6:00.

31.      On October 11, 2017 at 5:23 pm, CS1 called BARROS at Target Telephone 1 to ask for cocaine. During this call, BARROS told CS1 that he was "…gonna see my other man, my connect…" referring to a source of supply of narcotics.

32.      On October 11, 2017 at 6:15 pm, BARROS called      at **Target Telephone 2** asking if      was home yet.      replied, "Yeah, I'm just, um, meet me in a little bit because Big Boy supposed to be coming, so let me just get with him real quick."

33.      On October 11, 2017 at 6:30 pm, BARROS received a call from      who was using **Target Telephone 2** to say, "You can come through."

14

34.    While these calls were being made, surveillance was following BARROS from his home in Willimantic, Connecticut to the 7-Eleven on Route 32 in North Franklin, Connecticut. At the 7-Eleven gas pumps, BARROS met briefly with an individual identified as ████████ ("████"). During this brief meeting, investigators observed ████ at a gas pump, but making no attempt to pump gas. Earlier in the day, ████ discussed procuring Percocet pills from BARROS, and investigators believe the transaction happened during this meeting. Surveillance followed BARROS after this meeting, during which ████ called to have BARROS "come through." Surveillance followed BARROS in his vehicle through Norwich, Connecticut up to ████████████ Connecticut, where investigators believe ████ resides. Approximately a half hour later at 7:30 pm, surveillance observed BARROS's vehicle leave from ████████ and followed it as the vehicle drove to BARROS's residence in ████ Connecticut. Once he arrived home, BARROS texted ████████ at **Target Telephone 2** at 7:53 pm to say "Home." ████ responded, "Aight c u tomorrow."

35.    The drive from ████ residence to BARROS's residence was approximately 17 miles and takes an average of 25 minutes. Based on the above conversations, I believe that BARROS went to ████ residence to get a new supply of narcotics, and the quantity was significant enough to cause BARROS to check in with ████ and let ████ know he got home without trouble.

36.    On October 13, 2017 at 11:38 a.m., on Target Telephone 1, ████ (on **Target Telephone 2**) and BARROS (on Target Telephone 1) had the following conversation:

> BARROS - yo
> ████  yo
> ████  what's good my niggas
> BARROS - what up dog



▮▮▮▮ - what the fuck nigga why do you sound like that
BARROS - cuz I'm about to kill this bitch wake me up
▮▮▮▮ - nooo, why you leaving
BARROS - I was maybe gonna come over there maybe we chill
▮▮▮▮ - I'm home but um yo did you drop something yesterday
BARROS - did I drop something?
▮▮▮▮ - ya, are you missing any work?
BARROS - I don't believe don't think so why what did you find?
▮▮▮▮ I found a little bit of work and I had a couple people over here and you was one of them so I'm asking you first
BARROS - nah, if it wasn't in like I only keep my shit in ball and gram pieces so if it was not in there then it's definitely not me
▮▮▮▮ - I got it over here, no its powder though
BARROS - uhhh...that's probably not me cuz I got all my shit so I don't think it's me
▮▮▮▮ - alright
BARROS - I'm about to come over there anyways though
▮▮▮▮ - alright cool, I'm over here

Based on my training and experience, I believe that when ▮▮▮▮ asked BARROS "are you missing any work," he was asking BARROS if he was missing any cocaine. This belief is further strengthened by the comments later in the conversation, specially, where BARROS states, "I only keep my shit in ball and gram pieces," and ▮▮▮▮ replies "no its powder though." Cocaine is a powder and is frequently sold in "8-Ball" (1/8 of an ounce, which equals 3.5 grams) or gram quantities. Thus, in this conversation, ▮▮▮▮ and BARROS were discussing a gathering where people, including BARROS, gathered at ▮▮▮▮ home to process and/or package cocaine.

37.     Investigators believe that matters relevant to the offenses under investigation have been and continue to be facilitated using the **Target Telephone 2**.

## IV.     AUTHORIZATION REQUEST FOR PEN REGISTER / TRAP AND TRACE DEVICE

38.     This affidavit sets forth reasonable grounds to believe the information likely to be obtained by the installation and use of a pen-register device or process and trap-and-trace device

or process on the **Target Telephone 2** is relevant to the ongoing criminal investigation described above, as required by Title 18, United States Code, Section 3123(a). In addition, this affidavit sets forth specific and articulable facts showing that there are reasonable grounds to believe the electronic communications records and/or information concerning the **Target Telephone 2** is relevant and material to the ongoing criminal investigation described above, as required by Title 18, United States Code, Section 2703(d). Among other things, the pen register will assist in identifying co-conspirators by enabling agents to determine who is in contact with the **Target Telephone 2** in suspected furtherance of drug distribution activities and who SEMIDEY is contacting in furtherance of those activities.

39.     Accordingly, it is requested that the Court authorize the installation and use of a pen-register device or process and trap-and-trace device or process on the **Target Telephone 2** pursuant to Title 18, United States Code, Section 3123(a), and the disclosure of electronic communications records and/or information concerning the **Target Telephone 2**, pursuant to Title 18, United States Code, Section 2703(d).

## V.     AUTHORIZATION FOR PRECISE PHONE LOCATION INFORMATION FROM TARGET TELEPHONE 2

40.     Based on the foregoing, I also request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

41.     The purpose of the proposed search warrant is to assist investigators in locating potential stash houses, further co-conspirators, and source(s) of supply. ■■■■ is known to use more than one vehicle and he also receives rides from his friends, therefore, a physical GPS on his car would not be an effective investigative technique. Further, physical surveillance is difficult to achieve because ■■■■ travels in rural areas.

17

42. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **Target Telephone 2** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

43. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of **Target Telephone 2** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

44.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Target Telephone 2** outside of daytime hours. There is a necessity to collect precise location data on **Target Telephone 2** during the day and night because ▮▮▮▮▮ often works at night and the investigation has not determined ▮▮▮▮▮ pattern of drug distribution.

## VI.    CONCLUSION

45.    I believe the installation and use of pen register devices or processes and trap-and-trace devices or processes, as well as the requested electronic communications records and/or information concerning the **Target Telephone 2** will provide information that is relevant and material to the ongoing criminal investigation described above. Among other things, this information will assist in determining who is contacting ▮▮▮▮▮ and who he is contacting, in furtherance of narcotics distribution activities, and it will assist in locating him and his co-conspirators.

46. It is further requested that the Order, Application this affidavit, and any other related documents, be sealed until further order of the Court, as they reveal an ongoing investigation, and in order to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that working copies may be served on Special Agents and other investigative and law enforcement officers of the FBI, and federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, and the carriers for the **Target Telephone 2** as necessary to effectuate the Court's Order.

Respectfully submitted,

RYAN OATES
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me
on October 24, 2017

HONORABLE SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

20

**Attachment A (Target Telephone 2)**
**Property to be Searched**

1. The cellular telephone (Target Telephone 2) is assigned call number ███████ 5698, with International Mobile Subscriber Identity ███████████ whose wireless service provider is T-Mobile, a company headquartered at 4 Sylvan Way, Parsippany, New Jersey.
2. Information about the target telephone that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephone if it is subsequently assigned a different number.

**Attachment B (Target Telephone 2)**
**Particular Things to be Seized**

All information about the location of the Target Telephone (Target Telephone 2) described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile ("the Company), the Company, is required to disclose the Location Information to the FBI.  In addition, the Company must provide to the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Company services, including by initiating a signal to determine the location of the Target Telephone on the Company's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government or FBI agents.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).